Nickerson, J.
These consolidated actions arise from the Department of Environmental Protection’s issuance of a determination of applicability pursuant to the Wetlands Act, G.L.c. 131, §40. The applicant, Stuart Bornstein, and the local permitting agency, the Barnstable Conservation Commission, filed cross motions for judgment on the pleadings. The motions were firstheard on January 28, 2003. The court entertained further argument on April 1, 2003.
BACKGROUND
Stuart Bornstein is the owner of a parcel of land at the northerly end of Freezer Road in Barnstable. The parcel is bound to the north by Barnstable outer harbor, to the east by the inner harbor, to the west by the salt marsh and Rendezvous Creek, and to the south by the mainland. Bornstein sought a determination of applicability from the local Conservation Commission in 1997 so as to determine the location and extent of various features on the site which call into play the protective provisions of the Wetlands Act. G.L.c. 131, §40, para. 3.
The Commission, on June 26, 1998, issued a determination that various portions of the land were indeed subject to the strictures of the Wetlands Act. Bornstein sought a superseding determination from DEP. G.L.c. 131, §40, para. 19. One was forthcoming on December 4, 1998, which was more advantageous to Bornstein inasmuch as the regional DEP office found, contrary to the local Commission, that the eastern bank of the property was not a sediment source. A coastal bank which contributes sand to nearby beaches and dunes is a sediment source and is entitled to greater protection under wetlands regulations. 310 C.M.R. 10.30.
The Barnstable Commission next sought an adjudicatory hearing, a move challenged by Bornstein on a claim of lack of standing on the part of the local Commission. The administrative law judge found standing. The case proceeded to a formal hearing and the creation of an administrative record of some 1,671 pages. The hearing officer’s draft decision was adopted by the DEP Commissioner as her final order on April 9, 2001. A.R. 1561-86.
The Conservation Commission now claims DEP failed to delineate the land as land protected under the Rivers Protection Act, chapter 258 of the Acts of 1996. Bornstein takes issue with the DEP decision because the final decision reversed the regional officer’s superseding determination. In other words, the final decision saddles Bornstein with the finding that the easterly bank is a sediment source.
DISCUSSION
Bornstein argues that the local Commission lacks standing to contest the superseding regional determination at the state agency level. He draws support for his position from the portions of the regulations which suggest that “any person aggrieved by an Order” may seek redress from DEP. 310 C.M.R. 10.05(7)(a) read in conjunction with 310 C.M.R. 10.5(7)(j). The word Order refers to an order of conditions, the decision the permit-granting agency issues in response to a request to perform specific work in a specific wetland resource area. Had Section 10.05(7)(a) referred to persons aggrieved by an order or determination, then an appeal by the local Commission would be allowed, says Bornstein.
We need not dwell on the petitioner’s concern. The last sentence of 310 C.M.R. 10.05(7)(b) solves the problem:
When the Department is requested to issue a superseding determination or Order of Conditions, the conservation commissioner shall be a party to all agency proceedings and hearings before the Department. (Emphasis supplied).
The regulation expressly grants a role to the local Commission in state agency review. Moreover, in the case at hand, the Barnstable Commission fulfilled the traditional requisites for standing by asserting positions at odds with both the applicant and the state agency. See Marashlain v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721-22 (1996).
With regard to the easterly bank, Bornstein claims DEP erred in two respects. The easterly bank faces the inner harbor. From the water’s edge, one moving west would first encounter a sandy beach and then a revetment. At the top of the revetment the land rises slightly over a distance of ten feet until it reaches a shallow escarpment. A.R. 923. DEP’s final order determines that the easterly bank is a coastal bank, the top of which is the escarpment, and that the easterly bank is a sediment source. Bornstein’s position is that the top of the easterly bank is the top of the revetment. If the escarpment is not included in the coastal bank, then less of the site will be subject to regulation from a square area of land perspective. Moreover, only the escarpment is eroding, hence, only the escarpment makes the easterly bank a sediment source.
As authorized by statute, DEP has promulgated comprehensive regulations implementing the Wetlands Act. 310 C.M.R. 10.00 et seq. In an effort to further define the complex terms and practices in the area, DEP has issued a number of policy statements. While “coastal bank” is a term defined by regulation, the regulation fails to give criteria for determining the top of a coastal bank. 310 C.M.R. 10.30(2). Policy92-1, entitled Definition and Delineation Criteria for Coastal Bank, provides Bornstein with some ammunition in this fight.[1] The DEP publication arguably calls for a *460 determination that the top of the bank is the point where the slope of the bank is less than 10:1 and may be a point below the 100-year flood elevation. This portion of Policy 92-1 supports Bornstein.
Subpart E of Policy 92-1 calls for a different conclusion. Subpart E recognizes that there can be successive coastal banks separated by land subject to coastal storm flowage. This is precisely the situation on the easterly bank. By all accounts, storm water invades the ten-foot swath between the top of the revetment and the escarpment. The administrative law judge endorsed this view, but in light of the parties’ stipulation that there was only a single bank, she went through the semantic construct of saying the bank from the beach to the top of the escarpment was one bank which had been interrupted by erosion. A.R. 1571. No verbal contortions are necessary. A careful reading of the stipulation of the parties reveals that the stipulation dealt with the horizontal extent of the easterly bank, le., whether it ran the length of the easterly face of the property. Counsel, in stating the stipulation, expressly noted their continuing differences as to the unity, or lack thereof, in the bank’s vertical distance. A.R. 985-87.
The final order regarding the easterly bank was crafted from extensive, and at times conflicting, evidence. The administrative law judge was entitled to make decisions as to credibility. Martorano v. Department of Public Utilities, 401 Mass. 257, 261 (1987). Credibility decisions were made in the recommended decision in a methodical manner. E.g., A.R. 1571 (“He [Dr. Rosen] cut his investigation short when he came to the escarpment . . .”). No sound reason exists for this court to interfere with the agency’s findings. In short, the decision regarding the easterly bank, both as to its dimensions and as to its role as a sediment source, is supported by substantial evidence, free from arbitrary and capricious elements.
The Barnstable Conservation Commission claims DEP’s final determination fails to recognize that the site borders two rivers and, hence, is entitled to greater protection. The Rivers Protection Act, chapter 258 of the Acts of 1996, augmented the Wetlands Act by extending Wetlands Act restrictions to riverfront areas, i.e. land within 200 feet of a river.
Bomstein’s site is flanked on the west by Rendezvous Creek and on the east by the inner harbor. The local Commission disputes the latter reference, arguing that the waterway to the east is Maraspin Creek. This court adopts the terminology of the agency’s decision and calls the waterway the inner harbor. The inner harbor is bound to the east by a public road, Mill Way. Maraspin Creek runs into the inner harbor under the Mill Way Bridge. East of Mill Way, Maraspin Creek drains several acres of salt marsh and further to the east, has its start as a freshwater creek on the far side of Commerce Road.
The determination of where a river ends and an estuary or embayment begins is less than clear. All agree that Rendezvous and Maraspin Creeks are, in part, rivers. Both are, in part, natural perennial, flowing bodies of water that empty into the ocean. 310 C.M.R. 10.58(2)(a)1. All agree that a creek subject to tidal influence can be a river under the statute and regulations. 310 C.M.R. 10.58(2)1(h). The regulations provide two methods for determining the river/coastal waters boundary. First, the regulations call for an assessment of “riverine characteristics.” 310 C.M.R. 10.58(2)(c). The term riverine characteristics is further developed at 310 C.M.R. 10.58(2)1(h). While the lead sentence in 10.58(2) 1(h) speaks of fresh water assets, the latter reference to coastal areas and tidal influence clearly makes the subsection applicable to our problem. Riverine characteristics include unidirectional flow, whether influenced by the tide or not, and horizontal zonation. These two criteria are not intended to be an exhaustive list. The second method for determining the river/coastal waters boundary is the fall back provision of setting the mouth of the river at the point where the river’s banks cease to oppose each other. 310 C.M.R. 10.58(2)(c).
The administrative law judge waded carefully into this issue. There was a great deal of evidence, some of it conflicting. She hewed closely to the standard set forth in the regulations:
When a river flows into coastal waters or an embayment, the river ends where it no longer has primarily riverine characteristics.
(Emphasis supplied.) 310 C.M.R. 10.58(2)(c). Here, resolution of the problem seems to hinge less on determinations of credibility and more on the weighing of factors. A.R. 1576-85. Such is the prerogative of the administrative law judge and the agency. This court finds no good reason to disturb the findings. There was substantial evidence to conclude that in the vicinity of the site, Rendezvous Creek was so dominated by the tides that it had ceased to be a river. Likewise, the evidence clearly demonstrated that, at best, Maraspin Creek was not a river west of the Mill Way Bridge. To have found otherwise would be to ignore the overwhelming evidence. There was no need to resort to the fall back method mentioned in the regulations.
In adopting the administrative law judge’s recommended decision, the DEP Commissioner added her thoughts on the problem of river/coastal waters demarcation. A.R. 1561-62. Now the Barnstable Commission argues that the Commissioner engaged in rule-making and deprived the parties of due process when she did so. The logic of this claim is hard to tease out of the appellant’s brief. This jurist’s reading of the Commissioner’s comments reveals nothing beyond the Commissioner’s recognition that the line between river and estuary is hard to draw in the abstract but relatively clear in the case at hand.
*461 ORDER
For the above-stated reasons, the cross motions for judgment on the pleadings by Stuart Bernstein and the Barnstable Conservation Commission are DENIED. The final decision of the Commissioner of the Department of Environmental Protection, dated April 9, 2001, is AFFIRMED.

 Policy 92-1 does not appear in the record as a separate tabbed or indexed item. Nonetheless, it is frequently referenced in the administrative record. The court procured a copy of Policy 92-1 from DEP’s internet web site.